1

2

3

4

5

6

7

8

9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

10

11

12

13

14

15

OWNZONES MEDIA NETWORK,
INC.,

                    Plaintiff,

        v.

SYSTEMS IN MOTION, LLC.,

                    Defendant.

CASE NO. C14-0994JLR

ORDER GRANTING MOTION
TO STAY AND TO COMPEL
ARBITRATION

## I.    INTRODUCTION

16

17

18

19

20

        This matter comes before the court on Defendant Systems in Motion's ("SIM")

motion to stay the action and to compel arbitration.  (Mot. (Dkt. # 8).)  Having considered

the submissions of the parties, the balance of the record, and the relevant law, and

considering itself fully advised,[1] the court GRANTS the motion.

21

22

_____

        [1] "When a party has had an adequate opportunity to provide the trial court with evidence and a
memorandum of law, there is no prejudice in refusing to grant oral argument." *Partridge v. Reich*, 141

## II.   BACKGROUND

SIM and Plaintiff OwnZones Media Network, Inc. ("OwnZones") entered into an agreement that SIM would provide certain website development services for OwnZones' website.  (Compl. (Dkt. # 1) ¶ 6.)  The parties' contract included an ownership clause that provided, "when payment in full for all services rendered hereunder has been made by [OwnZones], [OwnZones] shall have all right, title and interest in and to any work product, patents, inventions or copyrightable material resulting from the performance of any of [SIM's] services under this Agreement."  (Nivsarkar Decl. (Dkt. # 9) Ex. A ("Contract") ¶ 4(b).)

The contract also provided that OwnZones would supply SIM with certain proprietary information necessary for SIM to complete the development services.  (*Id.* ¶ 3(a).)  A nondisclosure clause required SIM to treat that information as confidential: "Neither [SIM] . . . nor [its] officers, employees, directors, or advisors shall disclose to any third party any such confidential information without [OwnZones'] prior written approval."  (*Id.*)  SIM was also required to return the confidential information to OwnZones upon termination of the contract.  (*Id.* ¶ 4(c).)  In accordance with the contract, OwnZones provided SIM a copy of its proprietary source code to enable SIM to further develop OwnZones' website.  (Compl. ¶ 9.)

*//*

F.3d 920, 926 (9th Cir. 1998) (internal punctuation omitted).  Here, the issues have been thoroughly briefed by the parties and oral argument would not be of assistance to the court.  Accordingly, the court will not hold oral argument.

ORDER- 2

1    The contract also contained a survival clause that provided, in the event the

2    contract was terminated, the termination would be "without prejudice to any rights or

3    obligations of either party arising or existing up to the effective date of such termination,

4    or to paragraphs 3, 4, 6, 7, 8, 9 and 10 which are intended by this Agreement to survive

5    for a period of three (3) years after the termination of this Agreement." (Contract

6    ¶ 13(b)(vii).)  The referenced paragraphs include the ownership and nondisclosure

7    provisions discussed above.  (*See id.* ¶ 3-4.)

8    Finally, the contract contained an arbitration clause, which provided:

9    Any and all disputes, controversy or claims related to or arising in
     connection with this Agreement . . . will be referred to and settled by

10   binding arbitration in accordance with the Commercial Arbitration Rules of
     the American Arbitration Association ("AAA") then in effect.

11   (*Id.* ¶ 15.)

12   Over time, the parties' relationship soured.  On February 21, 2014, OwnZones

13   terminated the contract due to SIM's alleged failure to meet various contractual

14   obligations.  (Compl. ¶ 11.)  In March, 2014, OwnZones initiated arbitration against SIM

15   for breach of contract.  (*Id.* ¶ 12.)  In the arbitration proceedings, OwnZones alleges that

16   SIM failed to meet numerous development milestones, failed to implement certain code

17   functionality, and provided otherwise defective work.  (*See generally* Farbstein Decl.

18   (Dkt. # 10) Ex. A ("Am. Arb. Stmt").)  SIM, for its part, has asserted a counterclaim in

19   the arbitration proceedings that OwnZones has failed to pay amounts due under the

20   contract.  (Nivsarkar Decl. ¶ 3.)

21   *//*

22

ORDER- 3

1    In addition to the pending arbitration proceedings, OwnZones also brings this suit
2    in federal court.  In its complaint, OwnZones alleges that SIM posted the code developed
3    under the contract—which incorporates OwnZones' proprietary source code—on a
4    website without OwnZones' permission.  (Compl. ¶ 13.)  Specifically, a SIM employee
5    uploaded the code to a GitHub account on or around January 30, 2014.  (*Id.*; *see also* SIM
6    6/6/14 Letter (Dkt. # 15-1) (admitting that SIM copied code developed for OwnZones to
7    GitHub).)  GitHub is an online repository for website developers to share code both
8    publicly and privately.  (Compl. ¶ 13.)  The account, which was described on GitHub as a
9    "Best Buy game demo website," was apparently created for the purpose of demonstrating
10   the code to the company Best Buy, which contracts with SIM for web development
11   services.  (Compl. ¶ 13, 17; *see also* SIM 6/6/14 Letter (conceding that the account was
12   created for the purpose of demonstrating the code to Best Buy); SIM 6/20/14 Letter (Dkt.
13   # 15-2); GitHub Screen Shot (Dkt. # 14-2).)

14   It is undisputed that the code SIM uploaded to GitHub was publicly accessible for
15   some period of time; what is disputed is the length of time that the code was public.
16   OwnZones alleges in both its complaint and its arbitration statement that SIM made the
17   code public in January, 2014.  (Compl. ¶ 13; Am. Arb. Stmt. ¶ 25.)  Yet letters from
18   SIM's counsel, which OwnZones now relies upon in opposing SIM's motion to compel
19   arbitration, peg the date of publication as May, 2014.  (*See* SIM 6/6/14 Letter; SIM
20   6/20/14 Letter.)  At any rate, by June, 2014, SIM had removed the code from GitHub.
21   (Compl. ¶ 15.)

22

ORDER- 4

1    OwnZones also alleges that, in February 2014, SIM "shared" the developed

2  code—which included OwnZones' proprietary code—with Best Buy without OwnZones'

3  permission.  (Compl. ¶ 18.)  SIM's counsel admitted in a letter to OwnZones that SIM

4  "demonstrated" the code to Best Buy between February 4 and February 17, 2014.  (*See*

5  SIM 6/6/14 Letter.)

6    OwnZones did not learn of the GitHub posting or the demonstrations to BestBuy

7  until June, 2014.  (Compl. ¶ 13.)  Upon learning of those events, OwnZones amended its

8  statement of claims in the arbitration proceedings to include the facts surrounding the

9  GitHub account and Best Buy demonstrations, as well as a claim for breach of the

10  nondisclosure provision of the contract.  (*See* Am. Arb. Stmt. ¶¶ 23-30, 38-44.)

11  OwnZones also filed this suit in this court, bringing claims for misappropriation of trade

12  secrets and conversion.  (Compl. ¶¶ 20-34.)  SIM now moves to stay the case, arguing

13  that the trade secret and conversion claims should join the rest of the parties' dispute in

14  arbitration.  (*See generally* Mot.)

15                    **III.    ANALYSIS**

16  **A.    Arbitration Law**

17    "Federal substantive law governs the question of arbitrability."  *Simula, Inc. v.*

18  *Autoliv, Inc.*, 175 F.3d 716, 719 (9th Cir. 1999).  The Federal Arbitration Act mandates

19  that written agreements to arbitrate disputes "shall be valid, irrevocable, and enforceable,

20  save upon such grounds as exist at law or in equity for the avoidance of any contract."  9

21  U.S.C. § 2.  "By its terms, the Act 'leaves no place for the exercise of discretion by a

22  district court, but instead mandates that district courts *shall* direct the parties to proceed

1    to arbitration on issues as to which an arbitration agreement has been signed.'" *Chiron*

2    *Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000).  Accordingly,

3    a court's role is limited to determining:  (1) whether the parties agreed to arbitrate, and, if

4    so, (2) whether the scope of that agreement to arbitrate encompasses the claims at issue.

5    *Id.*  If a party seeking arbitration establishes these two factors, the court must compel

6    arbitration.  9 U.S.C. § 4; *Chiron,* 207 F.3d at 1130.  If a contract contains an arbitration

7    clause, there is a presumption of arbitrability.  *AT&T Techs., Inc. v. Comm'ns Workers of*

8    *America,* 475 U.S. 643, 650 (1986).  In that case, "any doubts concerning the scope of

9    arbitrable issues should be resolved in favor of arbitration."  *Simula*, 175 F.3d at 719.

10   **B.    Arbitrability of OwnZones' Claims**

11          The arbitrability of OwnZones' claims is complicated somewhat by the fact that

12   the claims are predicated on acts that occurred or were discovered after the parties'

13   contract was terminated.  The post-expiration effectiveness of the arbitration clause is

14   discussed in Section III.C, *infra*.  Before reaching that issue, however, the first step is to

15   determine whether the claims ordinarily would have been arbitrable under the parties'

16   contract.  *See Nolde Bros. v. Local No. 358, Bakery & Confectionery Workers Union,*

17   *AFL-CIO*, 430 U.S. 243, 252 (1977).  The court concludes that OwnZones' claims fall

18   within the scope of the contract's arbitration clause.

19          The parties agreed to arbitrate "[a]ny and all disputes, controversy or claims

20   related to or arising in connection with this Agreement."  (Contract ¶ 15.)  When

21   evaluating arbitration agreements, courts give the language "arising in connection with"

22   the broadest possible interpretation.  *See Kiskadee Commc'ns (Bermuda), Ltd. v. Father*,

No. C 10-05277 WHA, 2011 WL 1044241, at *2 (N.D. Cal. Mar. 22, 2011).  The Ninth

Circuit has concluded that "the language 'arising in connection with' reaches every

dispute between the parties having a significant relationship to the contract and all

disputes having their origin or genesis in the contract."  *Simula*, 175 F.3d at 721.  To

meet this standard, the plaintiff's factual allegations need only "touch matters covered by

the contract."  *Id.*  With that standard in mind, the court turns to OwnZones' claims.[2]

### 1.  Misappropriation of Trade Secrets

OwnZones first alleges a claim for misappropriation of trade secrets.  Faced with a

similar situation in *Simula*, the Ninth Circuit held that a claim for misappropriation of

trade secrets fell within an arbitration clause that applied to "all disputes arising in

connection with" the parties' agreement.  175 F.3d at 724-25.  The Ninth Circuit

reasoned that the dispute touched matters covered by the contract because resolving the

claim required determining to what extent the nondisclosure provision of the parties'

agreement prohibited the defendants' use of the allegedly confidential information.  *See*

*id.* at 725.  In compelling arbitration, the Ninth Circuit also relied on that fact that, as

defined by their agreement, the parties' "entire business relationship" was predicated on

sharing proprietary information pursuant to a confidentiality obligation.  *See id.*

---

[2] The parties dispute whether Washington or California state law applies to OwnZones' claims.
The court declines to decide the issue at this time.  The elements of misappropriation of trade secrets and
conversion of property claims are almost identical under Washington and California law.  *Compare* RCW
10.108 (adopting Uniform Trade Secrets Act in Washington) *with* Cal. Civ. Code § 3426 *et seq.* (adopting
Uniform Trade Secrets Act in California) *and* 16 Wash. Prac., Tort Law And Practice § 14:16 (4th ed.)
(listing elements of Washington tort of conversion) *with* 14A Cal. Jur. 3d Conversion § 1 (listing
elements of California tort of conversion).  Because the court's decision relies only on elements common
to both jurisdictions' law, the choice of law is immaterial to the outcome of the question of arbitrability.

1    So, too, here.  The parties have agreed to the same broad arbitration language at

2  issue in *Simula*, and their business relationship requires the sharing of OwnZones'

3  proprietary information pursuant to a confidentiality obligation.  *See id.*; *also Atlas Int'l*

4  *Mktg., LLC v. Car-E Diagnostics, Inc.*, No. 5:13-CV-02664-EJD, 2014 WL 3371842, at

5  *4-5 (N.D. Cal. July 9, 2014) (finding trade secrets claim was arbitrable because the

6  defendants' alleged theft and use of confidential information stored on the plaintiff's

7  computers was "related to the same business relationship that is governed by the [parties'

8  nondisclosure] agreement").

9    Not only that, but the factual allegations in OwnZones' trade secrets claim also

10  "touch matters covered by the contract"—namely, SIM's obligation under the contract to

11  keep OwnZones' code confidential.  *See Simula*, 175 F.3d at 721.  Under both

12  Washington and California law, misappropriation of trade secrets is defined in part as

13  "disclosure or use of a trade secret of another" by a person who "knew or had reason to

14  know that his or her knowledge of the trade secret was . . . acquired under circumstances

15  giving rise to a duty to maintain its secrecy or limit its use."  RCW 19.108.010(2); Cal.

16  Civ. Code § 3426.1(2).  OwnZones alleges that SIM had a duty to maintain the secrecy of

17  OwnZones' proprietary code based on the contract's "confidentiality and non-disclosure

18  provision, which prohibits defendant from sharing any information and/or data that is

19  owned by plaintiff unless sharing such information is expressly authorized by plaintiff."

20  (Compl. ¶¶ 8, 24.)  Because the parties' dispute over SIM's use and publication of the

21  code turns in part on the contracts' nondisclosure clause, the dispute has a "significant

22

ORDER- 8

1  relationship" to the parties' contract.  *See Simula*, 175 F.3d at 721.  As such, the dispute

2  is arbitrable.  *See id.*

3     **2.  Conversion**

4        OwnZones also alleges a claim for conversion.  Under both Washington and

5  California state law, conversion comprises willful interference with a plaintiff's

6  ownership or right to possession of personal property.  *See Brown ex rel. Richards v.*

7  *Brown*, 239 P.3d 602, 609 (Wash. Ct. App. 2010); *PCO, Inc. v. Christensen, Miller, Fink,*

8  *Jacobs, Glaser, Weil & Shapiro, LLP*, 58 Cal. Rptr. 3d 516, 524 (Cal. Ct. App. 2007).

9  The first element in a conversion claim is plaintiff's ownership or possession of the

10 property.  *See Moore v. Regents of Univ. of Cal.*, 793 P.2d 479, 488 (Cal. Ct. App. 1990);

11 *Meyers Way Dev. Ltd. P'ship v. Univ. Sav. Bank*, 910 P.2d 1308, 1320 (Wash. Ct. App.

12 1996).

13       The parties dispute who owns the source code at issue.  Specifically, OwnZones

14 alleges that it is the sole owner of the code SIM posted to GitHub.  (Compl. ¶ 29.)  But

15 SIM points out that, pursuant to the contract, OwnZones does not receive ownership of

16 the code until "payment in full for all services rendered . . . has been made." (*See*

17 Contract ¶ 4(b).)  SIM contends that OwnZones is delinquent on payments to SIM by

18 over $600,000.00, and therefore does not own the code.  (*See* Nivsarkar Decl. ¶ 3.

19 Moreover, according to the contract, SIM retains ownership of its own preexisting

20 proprietary software that is embedded into the deliverables.  (Mot. at 8 (quoting Contract

21 ¶ 4(a).)  The parties dispute the extent to which the code at issue consists of OwnZones'

22 preexisting proprietary information, SIM's preexisting proprietary information, and code

1  SIM developed for OwnZones pursuant to the contract.  (*See* Goman Decl. (Dkt. # 14)

2  ¶ 10 (claiming that 75% of the code is OwnZones' proprietary code); Reply (Dkt. # 17) at

3  2 (disagreeing with OwnZones' projection).)  As such, ownership of the code turns on the

4  extent to which the parties have fulfilled their respective obligations under the contract.

5  (*See, e.g.*, Contract at 11-26 (appendices describing SIM's deliverables).)  Because

6  determining ownership requires reference to the contract governing creation of the code,

7  OwnZones' factual allegations necessarily "touch matters covered by the contract."  *See*

8  *Simula*, 175 F.3d at 721.  Under *Simula*, the parties' dispute over SIM's alleged

9  conversion of the code has a "significant relationship" to the parties' contract; therefore,

10  the dispute is arbitrable.  *See id.*

11  **C.     Post-Expiration Applicability of the Arbitration Clause**

12         Because both of OwnZones' claims fall within the scope of the parties' arbitration

13  clause, the court would ordinarily direct the parties to proceed to arbitration immediately.

14  *See Chiron Corp,* 207 F.3d at 1130.  OwnZones, however, argues that the arbitration

15  clause is inapplicable because OwnZones' claims "arose" after the contract was

16  terminated.[3]  (Resp. (Dkt. # 13) at 6-7.)  Specifically, although OwnZones terminated the

17  contract at the end of February, 2014, SIM allegedly did not make the GitHub posting

18  //

19  //

20  _____

21    [3] OwnZones' position that its claims are not arbitrable due to the date they "arose" is contravened
by its recent introduction to the arbitration proceedings of a breach of contract claim predicated on the
22  same late-arising set of facts implicated here.  (*See* Am. Arb. Stmt. ¶¶ 23-30, 38-44.)

ORDER- 10

1    public until May, 2014,[4] and OwnZones did not discover SIM's GitHub posting until

2    June, 2014.  (*Id.* at 4-6.)  Nonetheless, the court finds that the dispute remains arbitrable.

3         Termination of a contract "does not necessarily extinguish a party's duty to

4    arbitrate grievances arising under the contract."  *O'Connor Co. v. Carpenters Local*

5    *Union No. 1408 of United Bhd. of Carpenters & Joiners of Am., AFL-CIO*, 702 F.2d 824,

6    825 (9th Cir. 1983) (citing *Nolde Brothers*, 430 U.S. at 251).  Rather, when a post-

7    expiration dispute arises under the contract, a presumption arises that the duty to arbitrate

8    outlasts the date of the contract's termination.  *Litton Fin. Printing Div., a Div. of Litton*

9    *Bus. Sys., Inc. v. N.L.R.B.*, 501 U.S. 190, 205-06 (1991) (citing *Nolde Bros.*, 430 U.S. at

10   253-55).  "A postexpiration grievance can be said to arise under the contract only where

11   it involves facts and occurrences that arose before expiration, where an action taken after

12   expiration infringes a right that accrued or vested under the agreement, or where, under

13   normal principles of contract interpretation, the disputed contractual right survives

14   expiration of the remainder of the agreement."  *Id.*  If the dispute meets one of these three

15   criteria, "the presumptions favoring arbitrability must be negated expressly or by clear

16   implication."  *Nolde Bros.*, 430 U.S. at 255.  Otherwise, the dispute is arbitrable.[5]  *Id.*

17

18   _____

19   [4] OwnZones' position that the posting was not public before May, 2014 contradicts the
     allegations in its complaint that the posting was public in January, 2014.  If the posting were public in
     January, OwnZones could point to no precipitating events arising after the contract's termination, and its
20   claims would be arbitrable.  In order to fully resolve the dispute over arbitrability, the court assumes,
     without deciding and for the purposes of this motion only, that the posting was indeed not public until
     after the contract's termination.

21   [5] Although this test arose in the context of labor agreements, recent caselaw makes clear that the
22   principles are equally applicable to commercial agreements.  *See Riso, Inc. v. Witt Co.*, No. 03:13-CV-
     02064-HZ, 2014 WL 3371731, at *17 (D. Or. July 9, 2014) (collecting cases).

1    OwnZones' claims meet all three of these criteria.  With respect to the first

2    criteria, the Ninth Circuit has held that, when events related to a claim occur both before

3    and after the contract's termination, "the determinative issue is not necessarily the

4    relative importance of the facts that took place before the [agreement's] expiration, but

5    whether those facts and the dispute over them is one that the parties agreed to arbitrate."

6    *Operating Eng'rs Local Union No. 3 v. Newmont Min. Corp.*, 476 F.3d 690, 693 (9th Cir.

7    2007).  "Although the pre-expiration facts or occurrences to be arbitrated must be of

8    *some* significance in the dispute, the dispute must be arbitrated if the parties agreed to

9    arbitrate those facts or occurrences."  *Id.*  It is immaterial whether the plaintiff discovered

10   the alleged misconduct before or after the expiration of the contract.  *Id.* at 694, n.1.

11   Here, OwnZones alleges that SIM (1) posted OwnZones' proprietary source code

12   on GitHub in January, 2013, and (2) "shared" this code with Best Buy in February, 2014,

13   all without OwnZones' permission.  (Compl. ¶¶ 11, 13, 18.)  These acts occurred before

14   OwnZones terminated the contract on February 21, 2014.  (*See id.* ¶ 11; SIM 6/6/14

15   Letter (explaining that the demonstrations occurred between February 4 and February 17,

16   2014).)  Under both Washington and California trade secrets law, misappropriation

17   occurs by "disclosure or use of a trade secret of another without express or implied

18   consent."  RCW 19.108.010(2); Cal. Civ. Code § 3426.1(2).  And under both Washington

19   and California law, conversion occurs by interference with a plaintiff's ownership or

20   right to possession of personal property.  *See Brown*, 239 P.3d at 609; *PCO, Inc.*, 58 Cal.

21   Rptr. 3d at 524.  SIM's alleged pre-termination actions meet both of these definitions.  In

22   addition, both parties' pre-termination acts are relevant to determining ownership of the

1   code, which is an element of both causes of action.  *See Moore*, 793 P.2d at 488; *Meyers*

2   *Way Dev.*, 910 P.2d at 1320; RCW 19.108.010(2); Cal. Civ. Code § 3426.1(2).  As such,

3   these events events are of "some significance" to OwnZones' trade secrets and

4   conversion claims.

5          As discussed above in Section III(B),  SIM's alleged pre-termination actions of

6   posting and sharing the code are arbitrable because they "touch on" matters covered by

7   the contract—namely, the confidentiality and ownership of the code.  Under Ninth

8   Circuit law, because the parties have agreed to arbitrate these pre-expiration occurrences,

9   and because these pre-expiration occurrences are of "some significance" to the parties'

10  dispute, the presumption of arbitration applies to the entire dispute.  *See Operating*

11  *Engineers Local Union No. 3*, 476 F.3d at 693; *Litton*, 501 U.S. at 205-06.

12         With respect to the second criteria, which concerns post-expiration actions that

13  infringe a right that accrued under the agreement, OwnZones' ownership and

14  confidentiality rights in the code have allegedly already accrued under the agreement.

15  (*See* Compl. ¶¶ 8, 24, 29.)  Because SIM's alleged post-termination action of publicly

16  posting the code interferes with those rights, the presumption of arbitrability applies to

17  OwnZones' trade secret and conversion claims.  *See Litton*, 501 U.S. at 205-206.

18         With respect to the third criteria, concerning situations in which the disputed

19  contractual right survives the agreement's expiration, the survival clause of the parties'

20  contract explicitly states that the nondisclosure and ownership provisions survive for

21  three years after the termination of the contract.  (Contract ¶ 13(vii).)  As such, both

22  SIM's obligation to keep OwnZones' pre-existing code confidential and OwnZones'

ownership rights to code developed pursuant to the contract survive.  (*See id.* ¶¶ 3, 4.)

Because these contractual rights are disputed within the context of OwnZones' trade

secret and conversion claims, the presumption of arbitration applies to those claims.  *See*

*Litton*, 501 U.S. at 207-08 ("And of course, if a collective-bargaining agreement provides

in explicit terms that certain benefits continue after the agreement's expiration, disputes

as to such continuing benefits may be found to arise under the agreement, and so become

subject to the contract's arbitration provisions.")

        Having determined that OwnZones' claims are presumptively arbitrable, the final

inquiry is whether this presumption is "negated expressly or by clear implication" in the

contract.  *Nolde Bros.*, 430 U.S. at 255.  Here, as in *Nolde Brothers*, there is "nothing in

the arbitration clause that expressly exclude[s] from its operation a dispute arising under

the contract but based upon events occurring after its termination."  430 U.S. at 253.  On

the other hand, the contract's survival clause does not include the arbitrability clause in

its list of the contract sections that explicitly survive termination of the contract.  (*See*

Contract ¶ 13(vii).)  One interpretation of this omission is that the parties did not intend

the arbitration clause to have post-expiration effect.

        Considering the contract as a whole, however, it is not clear that this list is

intended to be an exhaustive inventory of the contract provisions that survive termination

of the contract.  After all, in addition to an explicit list of contract provisions, the survival

clause also incorporates other unnamed rights and obligations, providing that "[a]ny

termination of this Agreement shall be without prejudice to any rights or obligations of

either party arising or existing up to the effective date of such termination."  (Contract

¶ 13(vii).)  Moreover, the survival clause omits certain procedural provisions that ordinarily would be expected to survive termination of the contract, including, for example, the contract's integration and severability clauses.  (*See id.* ¶ 13(vii), 23, 26.)  It would be a strained reading of the contract to conclude that, upon expiration, the parties no longer intended the agreement to be severable or the ban on extrinsic evidence to be in effect.  As such, an equally plausible interpretation of the survival clause is that it sets a floor, not a ceiling, for the survival of contract provisions.

In light of these dual plausible interpretations, the survival clause is, at best, ambiguous as to whether the parties' duty to arbitrate survives termination of the contract.  But courts must "construe ambiguities concerning the scope of arbitrability in favor of arbitration."  *Cape Flattery Ltd. v. Titan Mar., LLC*, 647 F.3d 914, 923 (9th Cir. 2011) (quoting *Mastrobuono v. Shearson Lehman Hutton, Inc.,* 514 U.S. 52, 66 (1995)). As such, the survival clause does not rise to the level of the "clear implication" necessary to rebut the presumption of arbitrability.  *See Nolde Bros.*, 430 U.S. at 255

This conclusion comports with the result and rationale of the only circuit court to address the issue to date.  The Sixth Circuit recently held that a survival clause that omitted the contract's arbitration clause did not clearly imply that the arbitration clause had no post-expiration effect.  *Huffman v. Hilltop Cos., LLC*, 747 F.3d 391, 398 (6th Cir. 2014).  The Sixth Circuit noted that because certain clauses—such as the severability and integration clauses— ordinarily expected to survive termination were also excluded from the survival clause, "ambiguity exists as to which other provisions . . . the parties intended to survive expiration of the agreement."  *Id.* at 397.  As a result, the reading that

1  the survival clause barred all non-listed provisions from survival was "not the only

2  reading, let alone the most plausible," and the resulting ambiguity was resolved in favor

3  of arbitration. *Id.* at 398. The Sixth Circuit concluded: "Reading the contract as a

4  whole, we cannot say with certainty that the parties did not intend for the arbitration

5  clause to survive expiration of the contract." *Id.* This same reasoning applies here.

6         In reaching this conclusion, the court is mindful of the strong presumption in favor

7  of arbitrability. *See AT&T Techs.*, 475 U.S. at 650; *Simula*, 175 F.3d at 719. The

8  Supreme Court has stated that where, as here, a parties' agreement contains a "broad"

9  arbitration clause, "an order to arbitrate the particular grievance should not be denied

10 unless it may be said with positive assurance that the arbitration clause is not susceptible

11 of an interpretation that covers the asserted dispute." *Litton*, 501 U.S. at 209. Because it

12 cannot be said with positive assurance that the parties' broad arbitration clause does not

13 cover the instant dispute, OwnZones' trade secret and conversion claims must be

14 arbitrated. *See* 9 U.S.C. § 4; *Chiron,* 207 F.3d at 1130.

15                            **IV.   CONCLUSION**

16        For the foregoing reasons, the court GRANTS Defendant's motion to stay and to

17 compel arbitration (Dkt. # 8.) The court STAYS the action and ORDERS the parties to

18 undertake arbitration pursuant to the terms of their contract.

19 //

20 //

21 //

22

ORDER- 16

1   The parties shall submit a joint status report within 10 days of the arbitrator's final

2   determination.

3        Dated this 12th day of September, 2014.

4

5

6        _____
         JAMES L. ROBART
7        United States District Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22